**Jack A. DOCA and Fannie C. Doca, Plaintiffs–Appellees,**

v.

**MARINA MERCANTE NICARAGUENSE, S.A. and Pittston Stevedoring Corp., Defendants–Appellants.**

**Nos. 629, 1006, Dockets 79–7626, 79–7637.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1980.

Decided Oct. 1, 1980.

Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, on brief), for defendant–appellant Marina Mercante Nicaraguense, S. A.

George G. Kilarjian, New York City (Bigham, Englar, Jones & Houston, New York City, on brief), for defendant–appellant Pittston Stevedoring Corp.

Morris Cizner, New York City (Zimmerman & Zimmerman, New York City, on brief), for plaintiffs–appellees.

Before FEINBERG, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal from a personal injury award, made pursuant to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950 (1976), primarily requires consideration of the effect of inflation in determining damages for loss of future wages.

Plaintiff Doca was employed as a cargo checker by Hamilton Terminal Company. He was injured when he slipped and fell while carrying out his assigned duties aboard the M. V. Costa Rica. Defendant Marina Mercante Nicaraguense, S. A. ("Marina") is the owner of the ship; it hired defendant Pittston Stevedoring Company ("Pittston") to unload the vessel, and Pittston in turn hired Hamilton to perform certain services in connection with the unloading. Doca went aboard the Costa Rica at the joint request of a Pittston supervisor and a Hamilton supervisor to check the hatches for the presence of some metal pipe. The path to Hatch # 4 along the offshore side of the vessel was surrounded by garbage, but there appeared to be a clear route through the center of it, covered with dunnage paper. In fact, there was a turnbuckle underneath the paper; as Doca proceeded toward Hatch # 4, he tripped on the turnbuckle and struck his head on the coaming, or rim of the hatch. As a result of this fall, Doca suffered a cerebral concussion and cervical spine injury. This left Doca with a series of neurological symptoms that were found to render him incapable of working, engaging in "most normal recreational activities," or having a normal sexual relationship with his wife.[1]

The District Court for the Southern District of New York (Kevin T. Duffy, Judge) found both the shipowner Marina and the stevedoring company Pittston negligent in causing Doca's injury, and, reflecting their relative responsibilities for the injury, found Marina liable for 90% and Pittston liable for 10% of damages totaling $669,127.

---

1. Doca's injuries were serious by themselves, but they were exacerbated by what the District Court found to be a post–traumatic conversion reaction. This reaction probably resulted from the fact that Doca had been injured previously, in 1950, when employed as a longshoreman, and had been unable to work for twelve years thereafter.

These damages included, among other items, $352,560 for Doca's wages from the date of trial for the 12–year remainder of his working life and $15,000 for his wife's loss of consortium.

Marina and Pittston appeal the judgment, raising issues concerning both liability and damages. We affirm as to liability and remand for redetermination of lost future wages.

## I. Liability

■■■ The liability issues are not substantial. The District Court's conclusion that both Marina and Pittston were negligent is fully supported by the evidence. The 1972 Amendments to the LHWCA had the effect of applying general tort principles regarding owners and occupiers of land to the duty of a shipowner toward those who come aboard for business reasons. 33 U.S.C. § 905; see H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4701–03; *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 507 (2d Cir. 1976), *Landon v. Lief Hoegh & Co.*, 521 F.2d 756, 762 (2d Cir. 1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976). This duty is to maintain the property in a reasonably safe condition in the light of all the circumstances. See W. Prosser, Handbook of the Law of Torts § 61 (4th ed. 1971); Restatement (Second) of Torts § 343. In the present case, the ship's deck was clearly in an unsafe condition; this was not simply a matter of one turnbuckle being covered by some paper, but of a general obstruction of the walking area by various types of refuse. The ship's crew had created this hazard, and the ship was primarily responsible for it. Moreover, the crew was aware of the hazard, as it had been pointed out to them by Pittston's hatch foreman, who asked them to clean it up. The ship could have contracted with Pittston to clean the deck but it did not do so, and thus retained its basic responsibility. The finding that Marina was 90% responsible for the accident is amply supported.

■■■ Pittston's liability is based on a regulation, promulgated by the Occupational Safety and Health Administration, 29 C.F.R. § 1918.91(a) (1979), which requires stevedores to keep their work area free of "tripping or stumbling hazards." The District Court held that this regulatory standard created a non–delegable duty to remove the hazard. The fact that the hazard was primarily the ship's responsibility does not excuse the stevedore from fulfilling its regulatory obligation; the stevedore was within its rights in asking the ship's crew to clean the deck, and presumably, it could have obtained monetary compensation for cleaning the deck itself. But since it continued working without making sure the deck was clean, it exposed itself to liability for violation of a statutorily established standard. See *Complaint of Allied Towing Corp.*, 416 F.Supp. 1207 (E.D.Va.1976), *aff'd in part, vacated in part on other grounds*, 580 F.2d 702 (4th Cir. 1978) (LHWCA case); *Martin v. Herzog*, 228 N.Y. 164, 126 N.E. 814 (1920); W. Prosser, *supra*, § 36 at 200–03. Pittston's argument that its duty does not run to Doca because Doca was not Pittston's employee cannot be maintained. Since Doca's company, Hamilton, was hired by Pittston, Doca's relationship to Pittston was effectively that of an employee, for purposes of the scope of the duty based on the OSHA regulation, especially since Doca was sent on the mission that led to his injury by a Pittston and a Hamilton supervisor, acting together.

■■■ The District Court was also justified in concluding that Doca was not contributorily negligent in taking the offshore route to Hatch # 4, or in not looking under the paper. The evidence indicated that it is a standard safety procedure to walk on the offshore side of a ship when the ship is being unloaded, since cargo is lifted over the inshore side. Of course, Doca might have looked underneath the paper before he walked on it. But the District Court was entitled to conclude that this would have been more than the reasonable care required of a business invitee.

■■■ The District Court was also entitled to find that neither of the defendants

had established a valid cross–claim for indemnity. Marina's contractual indemnity claim is defeated by the District Court's finding that Pittston's failure to observe the obligation of the OSHA regulation does not establish breach of a warranty of workmanship performance, even though it suffices to establish Pittston's negligence. The District Court also did not err in finding, alternatively, that Marina's own negligence, in the circumstances of this case, was sufficient to preclude an indemnity claim. See *Lopez v. Oldendorf*, 545 F.2d 836 (2d Cir. 1976), *cert. denied*, 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977); *Hurdrich v. Eastmount Shipping Corp.*, 503 F.2d 397 (2d Cir. 1974). Finally, the District Court was entitled to reject Pittston's tort theory indemnity claim, apparently predicated on the contention that Marina's negligence was active and Pittston's only passive. See *Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Co.*, 410 F.2d 178 (5th Cir. 1969), and cases there cited. The evidence of the omissions of both defendants justified the 90–10 allocation, properly reflecting the relative responsibility of the two tortfeasors, but did not compel a finding that Pittston must be relieved of its share of the damages.

## II. Damages

■ One of the damage issues–whether an injured worker's wife can recover for loss of consortium under the LHWCA–has now been authoritatively decided by *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). Appellants' challenge to the $15,000 loss of consortium component of the damage award is therefore rejected.[2]

The final and most significant question raised by this appeal is whether and to what extent an award for lost future wages should be adjusted because of inflation.[3] If an adjustment for inflation is to be made, two approaches are available. Under the first method the projection of current wages is increased to reflect the fact that the employee would have received cost of living increases to keep pace with inflation. The sum of those increased annual wage figures is then discounted to present value by the prevailing interest rate. See *United States v. English*, 521 F.2d 63, 75 (9th Cir. 1975). Under the second method the discount rate is decreased below the prevailing interest rate to reflect the estimated rate of inflation. This reduced discount rate is then applied to the sum of the current wages projected to continue for each of the years for which wages will be lost. See *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271 (D.Conn.1974), *aff'd*, 524 F.2d 384, 387–88 (2d Cir. 1975). If the same estimated inflation rate is used, the "outcome of the calculation under either approach would be very nearly identical," *Feldman, supra,* 524 F.2d at 391 (Friendly, J., concurring).

In this case the District Court took inflation into account, to an unspecified extent, apparently by using the second approach and adjusting for future inflation by decreasing the present value discount. The Court did not provide a computation for its award for loss of future earnings; however, Judge Duffy stated that he had reached his result by "considering both probability of continued inflation and a discount to present value." Doca infers that Judge Duffy used a discount factor of 1%.[4] De-

---

**2.** Liability in *Alvez* was grounded upon both negligence and unseaworthiness, the accident having occurred prior to the 1972 LHWCA amendments, which eliminated liability to longshoremen based on unseaworthiness. However, the 1972 amendments leave unaffected the Supreme Court's holding that damages for loss of consortium are available, under general maritime law, when liability is based on negligence.

**3.** The defendants advance no serious objections to the award for wages lost prior to trial or for

pain and suffering, and they stipulated the amount of medical costs.

**4.** Doca derives this 1% discount rate in the following manner. The difference between the award for lost wages, $352,560, and Doca's projection of future lost wages, $394,861, is $42,301. This difference represents approximately 1% of $352,560, multiplied by the 12 years for which future wages will be lost. Expressed as a formula, the computation would have been $x + (12i)x = w$, where x is the discounted value, i is the interest rate, and w is

fendants object to this computation for lack of evidence to support an estimate of future inflation and, more fundamentally, on the ground that any adjustment for inflation is impermissible. Since the significance of inflation on damage awards for lost future wages seems to be as persistent a problem as inflation itself, the matter merits some examination.

In this Circuit, the issue has been considered but not resolved. In *McWeeney v. New York, New Haven, & Hartford R. R. Co.*, 282 F.2d 34 (2d Cir.) (*en banc*), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), the issue was whether the calculation of lost future wages should be made on the basis of gross wages or net wages after deduction for income taxes. In rejecting a deduction for taxes, but see *Norfolk and Western Railway v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), this Court noted that whatever benefit this gives to plaintiffs is partially offset by the absence of an upward adjustment for inflation.[5] A decade later in *Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 443 F.2d 76 (2d Cir. 1971), a damage award for lost wages was reversed for reasons that included the failure to apply any discount for present value. Judge Friendly presciently noted that "if inflation should continue at its present pace, courts may have to reconsider the propriety of the long recognized charge with respect to discount." *Id.* at 79.

More recently this Court, in a diversity case, approved District Judge Blumenfeld's use of an " 'inflation–adjusted discount rate' " of 1.5%. *Feldman v. Allegheny Airlines, Inc., supra*, 524 F.2d at 387. This rate was determined by subtracting the average annual change in the consumer price index over each of several periods of years from the effective annual interest on government bonds held during each of the same periods, and then selecting the average of the rates resulting from these subtractions. *Feldman v. Allegheny Airlines, Inc., supra*, 382 F.Supp. at 1306–12. The purpose of this method was to determine the " 'real yield' " of money, the portion of interest charged on virtually risk–free investments that represents only the real cost of the money and not the additional cost the lender exacts as a hedge against future inflation. *Id.* at 1293. Judge Friendly concurred *dubitante*, noting that the decision represented a prediction as to unsettled state law and not "a precedent on the inflation problem in a case arising under federal law." 524 F.2d at 390, 393. In another diversity case, *Dullard v. Berkeley Associates Co.*, 606 F.2d 890, 896 (2d Cir. 1979), this Court was willing to assume the propriety of an inflation–adjusted discount rate only for purposes of ruling that even with such an adjustment applicable to lost future wages, the total award in question was excessive. Most recently, the Court, in a Federal Tort Claims Act case, approved use of a present value discount rate that had been reduced to 5% from the prevailing interest rate to reflect future inflation. *Espana v. United States*, 616 F.2d 41 (2d Cir. 1980).

Among other courts, there has been a growing recognition that inflation should be taken into account in damage calculations. At least four federal Courts of Appeals have explicitly so ruled, see *Steckler v. United States*, 549 F.2d 1375–78 (10th Cir. 1977); *United States v. English, supra*, 521 F.2d at 72–76; *Riha v. Jasper Blackburn Corp.*, 516 F.2d 840, 843–45 (8th Cir. 1975); *Bach v. Penn Central Transportation Co.*,

the projection of total future wages. If the District Court applied a 1% rate in this fashion (and we cannot be certain if the award for lost future wages was determined on this basis), the discount factor was incorrectly applied. The correct method is to apply to the future wages for each year a discount factor of $1/(1 + i)^n$, where i is the interest rate and n is the year for which present value of income is sought. *See Dullard v. Berkeley Associates Co.*, 606 F.2d

890 at 895 n.4. The discounted amounts for each year are then added together to determine the total award. Standard tables are available to avoid the need for calculations.

**5.** The other factor mentioned in *McWeeney* as offsetting the absence of a deduction for income taxes is the significant portion of the plaintiff's award that will be taken by the attorney's contingent fee. 282 F.2d at 38.

502 F.2d 1112, 1122 (6th Cir. 1974),[6] as have a number of state courts, see *e. g., Beaulieu v. Elliot,* 434 P.2d 665 (Alaska 1967); *Schnebly v. Baker,* 217 N.W.2d 708 (Iowa 1974); *Halliburton Co. v. Olivas,* 517 S.W.2d 349 (Tex.Civ.App.1974). In addition, the commentators generally favor this position. See Dennis, Sirmon & Drinkwater, *Wrongful Death Damages,* 47 Miss.L.J. 173 (1976); Formuzis & O'Donnell, *Inflation and the Valuation of Future Economic Losses,* 38 Mont.L.Rev. 297 (1977); Henderson, *The Consideration of Increased Productivity and the Discounting of Future Earnings to Present Value,* 20 S.D.L.Rev. 307 (1975); Hopkins, *Economics and Impaired Earning Capacity in Personal Injury Cases,* 44 Wash. L.Rev. 351 (1969); Note, *Future Inflation, Prospective Damages, and the Circuit Courts,* 63 Va.L.Rev. 105 (1977).

Though the Supreme Court has yet to rule definitively on the issue, it clearly indicated its approval of including inflation estimates in future wage loss awards in *Norfolk and Western Railway v. Liepelt, supra.* The issue in that case, as in *McWeeney,* was whether lost future wages in an F.E.L.A. case should be estimated without deduction for estimated income taxes. The Court ruled that such a reduction should be made. The opinion is instructive on the issue of inflation for two reasons. First, the Court noted that the plaintiff's economic expert had estimated that the lost future earnings would have increased by five percent a year until the wage–earner's retirement. More significantly, the Court rejected the argument that reduction for future income taxes would be too speculative by noting that other aspects of a damage award computation, specifically including "future inflation," are also matters of "estimate and prediction." 100 S.Ct. at 758. Thus, the Court not only noted that the award included an estimate for inflation, but also used

the reasonableness of making such an estimate as support for similar estimates of future taxes. See also *Grunenthal v. Long Island R. Co.,* 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), in which the Court approved a damage award based upon anticipated wage increases attributable to inflation.

Although the view that inflation should be considered is clearly on the increase, several federal courts including three Courts of Appeals, have prohibited the adjustment of awards for future wages to account for inflation. See *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975) (*en banc*); *Magill v. Westinghouse Electric Corp.,* 464 F.2d 294, 299–301 (3d Cir. 1972); *Williams v. United States,* 435 F.2d 804 (1st Cir. 1970). The principal rationale for these decisions is that estimates of future inflation are too speculative to serve as a basis for calculating damages. See *Penrod, supra,* 510 F.2d at 241; *Magill, supra,* 464 F.2d at 300; *Williams, supra,* 435 F.2d at 807.

We believe that the developing majority view is sound and that inflation should be considered in estimating the present value of lost future wages. According to the figures computed by the Bureau of Labor Statistics, United States Department of Labor, inflation has become a constant feature of our modern economy. The Consumer Price Index, perhaps the leading indicator of inflation, has increased in all but two years since the beginning of World War II, and in every year since 1955. This increase was particularly pronounced during the past decade, when the Index increased by five times as much as it had during the previous decade. In 1979, the year in which the District Court decided this case, the average annual Consumer Price Index was 217.4, compared to 100 in

**6.** Technically, only *Bach,* a Federal Employers' Liability Act suit, was decided under federal law. *English* and *Steckler* were cases brought under the Federal Tort Claims Act, to which local law applied, and *Riha* was a diversity case applying Nebraska law. However, in all these cases, the relevance of inflation was considered in light of general principles, without reference to any particular source of law. *See* Note, *Future Inflation, Prospective Damages, and the Circuit Courts,* 63 Va.L.Rev. 105 (1977). *See also Turcotte v. Ford Motor Co.,* 494 F.2d 173, 186–7 (1st Cir. 1974), explicitly relying on state law. *Cf. Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 308–313 (5th Cir. 1976) (Wisdom, J., concurring).

1967, the base year, and 72.1 in 1950.[7] Whether this trend has become an inherent feature of the international economy, irreversible by governmental action, is a subject of spirited debate among economists. See Friedman, *The Role of Money*, 58 Am.Econ. Rev. 1 (1968); Gordon, *Recent Developments in the Theory of Inflation and Unemployment* in *Modern Macro–Economics* (Parkin, ed. 1979); Kaldor, *Economic Growth and the Problem of Inflation*, in N. Kaldor, *Essays on Economic Policy* 166 (1965). But there is broad agreement that our economy, by its very nature, is subject to strong and persistent inflationary pressures, and that the complete elimination of inflation would require Draconian measures, at the very least. See T. Dernbury & D. McDougal, *Macroeconomics* 287–96 (5th ed. 1976); D. Nichols & C. Reynolds, *Principles of Economics* 485–95 (1971); L. Reynolds, *Economics* 180–87 (4th ed. 1973); P. Samuelson, *Economics* 820–37 (1976). In short, courts cannot fail to recognize that inflation is a dominant factor on the current economic scene and, despite episodic recessions, is likely to be so for the foreseeable future.

To be sure, the idea that a person's future income will increase in dollar amount is a prediction, one based largely on our inductive assumption that the future will resemble the past. But using inductive inferences about economic conditions to adjust the value of an award for lost future income is hardly novel. In fact, it underlies the practice of discounting future lost wages to the present value of the right to receive such wages. This practice, first required by the Supreme Court in 1916, *Chesapeake & Ohio Ry. v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916), and routinely followed by courts throughout the nation ever since, see E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 85.13 (1976); Note, *supra*, 63 Va.L.Rev. 105, rests on the inductive inference that interest rates will continue at their present level or above. Discounting to present value determines the amount of money that will produce the lost future wages if the lump sum award (and any interest it earns) is invested at prevailing interest rates. If interest rates decline after the lump sum award is received, the plaintiff will normally fail to realize the full dollar amount of the lost future wages.[8] If it is permissible, indeed required by *Kelly*, to make a prediction about interest rates, it seems as reasonable to make a prediction about inflation as well. See *Steckler, supra*, 549 F.2d at 1377.

In fact, as Judge Blumenfeld demonstrates by the data collected in *Feldman*, there is a fairly constant relationship between interest and inflation rates, so that it is more reasonable to make a prediction about the relationship of both rates than about the level of interest rates alone. Discounting without regard to inflation charges the plaintiff for that portion of the prevailing cost of money that represents

---

7. Thus, if Doca had received a damage award for twelve years' future wages in 1967, fully discounted to present value at then prevailing interest rates, and had invested this award at those prevailing interest rates with the intention of drawing out one–twelfth each year, his yearly amount, despite the interest, would have declined steadily in purchasing power. For the final year, 1979, the money would have been worth only 42% of what it was worth when the award was made.

8. At a minimum the plaintiff will earn compound interest only at the reduced prevailing interest rate. If the plaintiff invests his lump–sum award (plus earned interest) annually, he will also suffer a decrease of simple interest because of the reduced rates. It is possible for the plaintiff to avoid this latter reduction by investing his lump–sum award in long–term bonds, corresponding to the length of time for which the wages are lost. Yet if the plaintiff makes that type of investment, he takes the risk that if interest rates increase, the market value of his bonds will decrease, and he will suffer a loss each time he sells a bond to meet current needs. One way to avoid that risk is to purchase a series of bonds ranging in maturities from one year up to the number of years for which the wages were lost. That assures that each year's needs will be met from the proceeds of a maturing bond, without the risk of selling a bond at a discount. However, the average rate on such a series of short, medium, and long–term bonds will most likely be less than the rate on long–term bonds, which was used to discount the future wages to present value.

the lenders' anticipation of inflation without allowing the plaintiff an offsetting addition for inflation, either by increasing the sum to be discounted or reducing the discount rate. Or, to put it another way, discounting necessarily includes a prediction about inflation (the prediction made by those who determine the interest rate), and it is neither reasonable nor fair to use that prediction only to reduce an award instead of endeavoring to determine an award that approximates the present value of what the future wages would have been. Economics should not be an instrument for the under-compensation of plaintiffs. It should be used to achieve a realistic estimate of future conditions, so that an injured plaintiff can be compensated for his loss as fairly and completely as possible.[9]

The principal argument advanced against taking inflation into account is that it is too speculative. There can be no doubt that predicting next year's inflation rate is at least as hazardous a task as forecasting next year's weather. This concern about speculation persuades us to be rather cautious in determining the way in which inflation should be taken into account, but, for three reasons, is not sufficient to preclude any adjustment for inflation. First, the law of damages frequently recognizes the need to make some predictions about the future, despite the uncertainties of doing so. Estimates of lost future profits are an obvious example. See *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 564–67 (2d Cir. 1970). Second, since discounting future lost wages to present value uses an interest rate that reflects inflation, the issue is not whether inflation is too speculative to be considered at all; it is whether inflation, as a component of interest rates, should be considered for the defendant (by discounting at the prevailing interest rate) but ignored for the plaintiff (by rejecting any compensating adjustment for inflation).

Finally, and most important, as *Feldman* illustrates, it is entirely feasible to take inflation into account without making any prediction as to the specific level of future inflation rates. All that is needed is a prediction that in the future inflation rates will bear approximately the same relationship to long–term interest rates that they have in the past. Essentially the only premise for that prediction is that over the course of years investors in long–term bonds will demand returns that reflect the prospects of future inflation. They may guess wrong in some years and accept rates that fail to keep pace with inflation. "Yet common sense suggests," as Judge Friendly has pointed out, "that investors will not tolerate such a situation indefinitely." *Feldman, supra*, 524 F.2d at 392. These considerations persuade us that inflation is not too speculative to be taken into account in determining awards for future lost wages. See *Norfolk and Western Railway v. Liepelt, supra*.

The next question is how inflation should be considered. Courts have favored various methods, which can generally be divided into two basic categories. In the first category are those methods that submit the question of the inflation rate to the fact-finder, so that a separate determination is made in each case. In this category, one method treats the rate of future inflation as a fact to be proved by evidence, presumably expert opinion. See, *e. g., United States v. English, supra*, 521 F.2d at 75–76. Another method forbids evidence, but permits the fact–finder to apply his own knowledge and prediction in estimating a future inflation rate. See, *e. g., Bach v. Penn Central Transportation Co., supra*, 502 F.2d at 1122–23. A third method permits the fact–finder to apply his own knowledge but also permits expert testimony. See, *e. g., Riha v. Jasper Blackburn Corp., supra*, 516 F.2d at 845. In the other basic catego-

**9.** It is worth noting that when the Supreme Court declared its present value discount rule in 1916, it was able to look back on an era when prices, though fluctuating, were not generally increasing. The estimated Consumer Price Index for 1916 stood at 32.7, having var-ied between 25 and 51 during the course of the previous century. Looking backward over the past four decades from 1980, rather than 1916, reveals an entirely different economic landscape, in which prices have increased almost every year, often at an accelerating rate.

ry are methods that remove the issue from the fact–finder and instead adopt a rule of law that focuses on a constant relationship between inflation and interest rates. Using this approach, the Alaska Supreme Court held that the inflation rate will be assumed to equal the interest rate, thereby eliminating any discount for present value. See *Beaulieu v. Elliot, supra.* A somewhat different technique was used in *Feldman,* where it was observed that over a period of years the inflation rate bore a relatively constant relationship to the interest rate, averaging 1.5% less; the Court used this 1.5% rate as a discount rate, reflecting the true cost of money with the effect of inflation removed.

■ Having considered these alternatives, we are not prepared to require any one particular method by which inflation should be taken into account in estimating lost future wages. Predictive techniques are constantly being refined, as are methods of correctly assessing the immediate past. If litigants prefer to offer evidence as to future rates of both inflation and interest, they are entitled to do so. We note, however, that one virtue of the *Feldman* approach is that it lessens trial disputes concerning the future impact of inflation. The average accident trial should not be converted into a graduate seminar on economic forecasting. The adjusted discount rate approach of *Feldman* avoids all predictions about the level of future infla-

tion, and focuses instead only on the relationship between the inflation rate and the interest rate. Since that relationship is relatively constant in periods of stable inflation, as the historical data set forth in *Feldman* reveal, it may frequently be possible for litigants to agree on an adjusted discount rate, derived from that type of historical data. Without requiring a particular adjusted rate, we suggest that a 2% discount rate would normally be fair to both sides.

A 2% discount rate appears to be the estimate of the true cost of money appropriate for use in a computation whose purpose is to determine the present value of lost future wages. As Judge Blumenfeld recognized in *Feldman,* 2% is the real yield normally attainable during periods of low, stable rates of inflation. *Feldman, supra,* 382 F.Supp. at 1293, 1310 (Table A–II). It is also a figure that lies within the narrow range bracketed by many economists as representing the true yield of money.[10] *Feldman* used the slightly lower rate of 1.5% to allow "a margin of error to compensate for unexpected increases in the rate of inflation which may depress long term real yields." *Id.* at 1294 (footnote omitted). It may well be that during periods of unusually high inflation rates, interest rates will lag somewhat behind the inflation rate, at least temporarily, with the result that the interest return on a discounted lump sum award will not fully keep pace with infla-

10. Although economists disagree over the validity of the assumption that the real rate of interest is constant and consequently independent of inflation, *cf.* Fama, *Interest Rates and Inflation: The Message in the Entrails,* 67 Amer.Econ.Rev. 487 (1977) (real rate constant) *with* Carlson, *Short–Term Interest Rates as Predictors of Inflation: A Comment,* 67 Amer. Econ.Rev. 469 (1977) (real rate varies), there is substantial opinion that during periods of stable rates of inflation, the real yield of money, whether constant or slightly fluctuating, is approximately 2%, as estimated in *Feldman.* As Sharpe has suggested, an appropriate period for determining investor expectations of inflation and real rates of return is 1959–1972, when actual real returns may have been fairly close to expected real returns. W. Sharpe, *Investments* 170 (1978). For this period the *Feldman*

calculation approximates 2%. Moreover, studies by economists, though taking different positions concerning the relation between the real rate and expectations about inflation, have estimated that the real rate of interest was between 1.5% and 3% for a similar time frame. *See, e. g.,* Carlson, *supra,* at 471 (expected real rate fluctuates around 2.5% during 1953–1975); Elliott, *Measuring the Expected Real Rate of Interest: An Exploration of Macroeconomic Alternatives,* 67 Amer.Econ.Rev. 429, 440 (1977) (mean expected real rate 1.44% for 1960–1974); Gibson, *Interest Rates and Inflationary Expectations: New Evidence,* 62 Amer.Econ. Rev. 854, 856 (1972) (real rate between 2% and 3% during 1952–1970); *but cf.* W. Sharpe, *supra,* at 170 (extrapolating from 1976 study by Ibbotson & Sinquefield, average actual real rate 1.2% for 1959–1972).

tion.[11] But in such periods of high inflation, wages too will not keep pace with inflation. In the only three years since 1947 when the rate of the annual increase in the Consumer Price Index (CPI) exceeded 8%, the annual rate of wage increases (non–farm weekly earnings) has been less than the annual rate of CPI increases by at least 3 percentage points; in all other years since 1947, wages have increased at a rate greater than the rate of increase in the CPI or at least at a rate within 1 percentage point of the CPI percentage increase.[12] Thus, since there is little reason to expect that injured plaintiffs would have received wage increases sufficient to keep pace with unusually high rates of inflation, a present value discount rate normally need not be reduced below 2% just to compensate for unusually high inflation. To do so would ignore the basic objective of selecting a present sum of money that will replace what the future wages would have been.

We emphasize that we are not requiring the use of an adjusted discount rate, nor specifying that when such a rate is used, it must be set at 2%. Litigants are free to account for inflation in other ways, or, if they use the adjusted discount rate approach, to offer evidence of a rate more appropriate than 2%. But in the hope that disputes about the appropriate rate may be minimized, we simply suggest the 2% rate as one that would normally be fair for the parties to agree upon, and we authorize district judges to use such a rate if the parties elect not to offer any evidence on the subject of either inflation or present value discount.

 Obviously in this case the District Judge could not have been expected to anticipate this opinion. Nevertheless, his cal-

culation of an award for lost future wages must be reconsidered for two reasons. First, if we assume, as the plaintiff urges, that a 1% discount rate was used, there is nothing in the evidence to support a reduction of the discount rate from prevailing interest rates all the way down to 1%. As indicated, the lowest discount rate we are willing to approve, in the absence of historical data justifying a different rate, is 2%. Second, the District Court to some extent gave duplicative consideration to the impact of inflation. In estimating what Doca's future wages would have been, the Court took into account a post–trial wage increase of 80¢ an hour, specified in Doca's union contract to take effect on October 1, 1979. Having based future lost wages on this cost of living increase, the Court then further reflected the impact of inflation by reducing the discount rate to 1%. When a discount rate is adjusted to reflect inflation, it must be applied to a stream of earnings calculated without regard to inflation, even to a cost of living increase already scheduled to occur. The certainty of such an increase does not lessen the fact that it reflects inflation, which is already accounted for by the reduced discount rate.

We therefore vacate the damage award and remand to the District Court for recomputation of the award for lost future wages in accordance with this opinion. In all other respects the judgment is affirmed.

Affirmed in part, vacated in part, and remanded.

---

**11.** *See* I. Fisher, The Theory of Interest 43 (1930) ("[W]hen prices are rising, the rate of interest tends to be high but not as high as it should be to compensate for the rise.").

**12.** For 1974, the annual rate of increase in the CPI was 10.97%, and the annual rate of increase in weekly non–farm wages was 6.44%. For 1975, the comparable figures were 9.14% and 5.67%; for 1979, 11.26% and 7.66%. These earnings figures and the summary for the years since 1947, expressed in the text, are derived from figures reported in Bureau of Labor Statistics, U. S. Dept. of Labor, *Employment and Earnings, United States, 1909–78* 3 (1979) (for years 1947–1976) and Bureau of Labor Statistics, U. S. Dept. of Labor, *Employment and Earnings Supplement Revised Establishment Data* 1–2 (August 1980) (for years 1977–1979). Price figures are derived from figures reported in *1980 Economic Report of the President* 159 (1980).