**Alfred J. KERNALL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV–81–1744.**

United States District Court, E.D. New York.

Dec. 15, 1982.

Koenigsberg, Norman, Schneider & Biller, New York City (Herman M. Koeningsberg and Graham Mark Schneider, New York City, of counsel), for plaintiff.

Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y. (Patrick B. Northup, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for the U.S.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This is an action brought by plaintiff, Alfred J. Kernall, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking to recover damages for injuries alleged to have been caused by the negligence of medical personnel at the Veterans Administration Medical Center in Brooklyn, New York, in the period December 28, 1979, through January 4, 1980, when plaintiff was a patient at the facility.

Jurisdiction exists under 28 U.S.C. § 1346(b) since plaintiff has complied with the prerequisites to suit set forth in 28 U.S.C. § 2671 et seq.

The case was tried before the undersigned, sitting without a jury, in August and September, 1982. Based on the evidence introduced at the trial I conclude that plaintiff sustained injury as a result of negligence on the part of medical personnel at the VA hospital. In brief summary, plaintiff, who is a victim of an incurable and progressive neurological disorder known as syringomyelia, was negligently allowed to develop a severe infection, while in the care of the Medical Center. The infection necessitated a series of radical surgical procedures involving the amputation of one finger and the excision of tendons and muscles in the plaintiff's right arm. The defendant's negligence caused plaintiff severe emotional distress for a brief period in early January, 1980, until he was able to secure competent medical care, as well as distress and discomfort of a less extreme sort associated with the prolonged hospital stay and series of operations which were necessary in order to deal with the infection. In addition, plaintiff suffered an acceleration in the loss of use of the fingers of plaintiff's right hand by a number of years, as a result of defendant's misconduct. Because plaintiff's disease was of such a nature as to deprive him almost totally of sensations of pain he does not claim damages for injury in that form. Nor, because of the disabling effects of his neurological disorder, has he suffered any lost wages as a result of defendant's negligence. In sum, plaintiff appears entitled to damages in the amount of $28,209.65 on account of his emotional distress, discomfort, and the accelerated loss of use of the fingers of his right hand. What follows sets forth the findings of fact and conclusions of law on which these determinations are based as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff is a 54 year old male who resides in this District with his wife. He has suffered since his late twenties from syringomyelia, a progressively disabling neurological disorder characterized by loss of sensation in the extremities, loss of balance and chronic back pain. In the early 1970's plaintiff retired because of his disability from the Post Office where he had worked as a driver, and he has been physically

incapacitated from working since that time. The symptoms of syringomyelia include loss of sensation to such a degree that plaintiff was, at the time of his hospitalization in late 1979, almost incapable of feeling pain in his extremities ·and was insensitive to changes in his body temperature.

Plaintiff was admitted, at around 2 P.M., on December 28, 1979, to the Veterans Administration Medical Center in Brooklyn complaining of low back pain and difficulty in urinating, both associated with his neurological condition. Upon admission he was perceived to have an open wound on the inside of his right hand which appeared to the admitting nurse to be oozing. His temperature was above normal and a blood analysis showed an abnormal white blood corpuscle count of 10,100 as well as other signs of infection.

Despite these signs of infection, nothing appears to have been done for plaintiff on December 29, 1979, the day following his admission apart from administering Motrin and recording his temperature which remained above normal. No progress notes are recorded indicating any attention to the patient. Nor do there appear to be any doctor's orders recorded.

On the next day, December 30, 1979, plaintiff's infection appears to have attracted the attention of a nurse who noted that the patient "has open deep wound in the 2nd and 3rd joint of finger on right hand. Wound is draining thick yellowish foul smelling drainages. Hand was soaked in Betadine and warm $H_2O$ then flushed out with $H_2O_2$, providone. Iodine was applied." No doctor's order appears directing this treatment.[1]

A note for December 31, 1979, records that the same surface treatment for infection was administered on that date and that plaintiff was sent for an X-ray of his hand. This X-ray was not produced as part of the file produced by the hospital. The only radiologist's report in the file was apparently not transcribed until January 7, 1980. A single undated document entitled "On service note" records that an "X-ray of the hand showed no signs of osteomyelitis. However, there appears to be a metallic foreign body at the base of the 3rd digit. Case was discussed with the dermatologist who suggested soaking the hand in $H_2O_2$, Betadine and _____ [left blank in original]. No antibiotics needed." This document raises more questions than it answers. Not only was osteomyelitis discovered on surgical intervention, a few days later, but the location of the metallic object recorded in the note is different from the location from which it was eventually removed and at which it was eventually described as being located in the radiologist's report.

Also on December 31, 1979, a request was made for a dermatological consultation, an account of "marked swelling and pain [sic] of his finger on the right hand. He also has purulent discharge from this area." The provisional diagnosis reads "(1) syringomyelia (2) Rule out osteomyelitis of fingers." A response to the request for consultation was asked for "today."

No response was given to his request on December 31, 1979, or the next day. In fact on New Year's day plaintiff appears to have been virtually unattended; not even his temperature and respiration were recorded. Instead, an almost illegible reply from a dermatologist was prepared January 2, 1980, which stated among other things: "a deep ulcer in flex or crease of right middle finger exposing tendon, x-ray showed a metallic foreign body there (according to progress note). Please get *ortho-pedic* [emphasis in original] consultation, until then, $H_2O_2$ cleansing and sterile dressing with Betadine soaks should be used. Get Bacterial cultures and give antibiotics accordingly."

---

1. The records of the hospital are peculiar in other respects. Not only are there gaps in the record of treatments, but some entries for several days appear to have been written at one sitting. Several progress notes bear no date at all. Some suggest an attempt at self-justification, written after plaintiff signed himself out on January 5, 1980. Thus, a note by one doctor, dated January 7, 1980, records after-the-fact a series of unanswered requests for an electrocardiogram, and another note states that plaintiff's hand was not infected at a time when it was clearly being treated as if it were.

A document entitled "On [the handwritten word "off" is crossed out] service note" dated "1/2/80" records, among other things, "exposure of tendon on (R) 3rd finger. No infection [sic]. X-ray showed osteosclerosis on the 3rd phalange ... ulcer on the (R) 3rd finger from trophic change or initiated by poor sensation caused trauma, osteomyelitis should be ruled out. Plan: (1) Consult orthopedics (2) local antiseptic (H₂O₂), Betadine and ointment) with dressing change. (3) No systemic antibiotics indicated at this moment of time."

Another briefer note by the "attending" [doctor] also dated 1/2/80, notes simply "middle aged Black with history of syringomyelia. Admitted with low back pain infected [sic] digital joints, will need GV consult and neuro f/u."

No cultures appear to have been obtained as suggested in the January 2 dermatologist's report. Nor does there appear to have been any new orthopedic consultation obtained as suggested by the dermatologist although a request for an orthopedic examination made December 31, 1979 (or perhaps earlier since the date of the day is written over) was answered either January 3 or 5, 1980 (again the date of the day has been written over). The orthopedist simply notes that the patient "has open wound on the volar aspect (R) middle finger with flexor tendon exposed, abundant slough" for which he recommends hydrogen peroxide soaks.

On the same day, January 3, 1980 a blood count—the first ordered since December 31, 1979, despite the professed concern that the patient was suffering from osteomyelitis, or infection of the bone, showed an increase of the white blood cell count to 12,800.

On January 4, 1980 a doctor's progress note records, "irrigation and dressing change, 2 times by me and 2 times by the nurses in the (R) middle finger which was [sic] not looking good with some necrotic tissue and bad odor. Culture sent. Besides local RX with H₂O₂ and Betadine will [sic] consider systemic antibiotics."

On January 5, 1980, plaintiff, who testified that he believed he had been left to die, signed himself out "against medical advice" and checked into the Public Health Service ("PHS") hospital in Brooklyn. There, he was immediately diagnosed as suffering from "gas gangrene," an anaerobic bacterial infection which attacks the tissues beneath the skin producing bubbles of gas under the skin and necrosis of the muscle. Plaintiff's arm was surgically opened from the hand near the base of the middle finger of the right hand, where the open wound had been observed and treated at the VA hospital, all the way up the forearm. Necrotic muscle tissue was removed.[2] A piece of a metallic needle was identified by the surgeon as "apparently the foreign body which was the source of the infection." During the operation this "small .... needle piece" was removed from a position "at the carpal level itself, close to the carpal ligament," *i.e.*, at the wrist, according to the surgeon's report.

Also on January 2, 1980 plaintiff produced a blood count of 23,000 and a temperature in the area of 102° which lasted through January 9, 1980.

2. The government's expert witness concluded that the doctors who performed the operation erred in concluding both pre-operatively and post-operatively that the proper diagnosis of plaintiff's condition was gas gangrene or anaerobic myonecrosis. In order to sustain this opinion, the government's expert read the detailed operation report as finding no necrotic muscle tissue. However, a fair reading of the report makes clear that necrotic muscle tissue—a clear indicia of gas gangrene or of another myonecrotic infection—was found and removed. Moreover, to believe that the surgeon who performed the operation would have failed to record explicitly the absence of any necrotic muscle tissue in an operation designed to deal with an infection the seriousness of which is, in large part, defined by its attack on the muscles is not justified by anything in the record concerning the qualifications of the doctors who operated on plaintiff. Further, a tissue examination report by the Assistant Chief of the hospital's pathology department, dated January 9, 1980, explicitly reports both on microscopic and gross examination necrotic muscle tissue as among the tissues removed during the operation.

The government argues that plaintiff was not suffering from gas gangrene but "that the infection was of a much different and much more transient type." This argument is supported to a degree by the microbiological cultures and smears taken at the time of plaintiff's January 5, 1980, operation. What the cultures suggest is that the "myonecrosis" (muscle death) and gas formation observed during the surgery in plaintiff's forearm may not have been produced by the anaerobic clostridial bacteria associated with gas gangrene (the full name for which is clostridial myonecrosis) but rather by other bacteria, including staphylococcus aureau and streptococcus grade D, associated with non-clostridial myonecrosis. *See,* Cecil *Textbook of Medicine,* (15th Ed.1979) p. 443 *et seq.* This distinction may explain why plaintiff did not die from defendant's negligence ("untreated, fully developed clostridial myonecrosis is almost always fatal," *id.* at 434). The fact remains that plaintiff was suffering from undiagnosed anaerobic myonecrosis as well as osteomyelitis and that these contributed directly to plaintiff's injuries.

Plaintiff's initial operation on January 5, 1980 was followed by a hospital stay which lasted through May 1 of the same year. During that period of time plaintiff had six additional operations. The first, involving further debridement and removal of necrotic muscle and tendons, occurred on January 9, 1980.[3]

On January 14, 1980, plaintiff's middle finger was amputated because of necrosis of the bone marrow.[4]

On January 23, 1980, a skin graft was taken from plaintiff's thigh to aid in closing his right forearm wound. On February 13, 1980, further debridement of dead tissue on the right hand and wrist was necessary. On March 24 and April 16, 1980, further operations were performed to debride additional necrotic tissue in the right hand.[5] In the April 16 operation the wound was closed with four wires and a drain. On May 1, 1980, plaintiff was discharged from the PHS hospital. In September 1980 plaintiff returned to the PHS hospital since his wound had failed to close. His admitting history, taken at this time, describes the cause for his earlier operations as a "gas forming streptococcus infection." On September 16, 1980, plaintiff was again operated on for a "chronic open draining wound, right palm and wrist."

In February and March, 1981, plaintiff again returned to the PHS hospital because of a "less than adequate functioning hand". The removal of tendons from all of plaintiff's fingers as a result of his earlier operations, coupled with the ineffectiveness of plaintiff's thumb as a result of his syringomyelia, had rendered plaintiff's right hand non-functional. A hand consultant, Dr. Carrol, after examining plaintiff and taking into account his syringomyelia, concluded that a transfer of the index finger to the site of the amputated middle finger might

---

3. Plaintiff's expert relies on the operating report for this operation, which resulted in "healthy tissue of the forearm muscle with occasional necrotic sheath and deep fascia in the palm," as evidence that plaintiff never suffered any myonecrosis. However, the fact that this operation, which was "status post [the] fasciotomy and debridement" of January 5, 1980, disclosed no further muscle necrosis does not establish that plaintiff was not suffering from muscle necrosis as a result of infection before January 5. The operating report appears simply to have remarked on the absence of further necrotic muscle in the forearm, while finding further muscle necrosis in the hand.

4. It is arguable that the VA hospital's failure to treat plaintiff's osteomyelitis leading to his amputation did not result from the same acts of negligence which resulted in his myonecrosis.

The neglect of plaintiff's infected finger, including the delay in "ruling out" osteomyelitis, provides, however, an independent basis to liability for this loss.

5. While the government's expert testified that there appear no references to "gas gangrene" after the laboratory report of January 9, 1980, in fact, the records of the April 16, 1980 operation—the last before plaintiff's discharge—continue to refer to plaintiff's condition as "syringomyelia; status post operations on right hand and arm for gas gangrene." However, the condition *is also described in records relating to* the same operation as "status-post cellulitis of the right hand," a condition different from gas gangrene, which also can produce, as here, myonecrosis. *See* Cecil, *supra* at 434.

give plaintiff pincer movement. An operation was performed in an effort to improve the function of plaintiff's right hand on February 24, 1981, and plaintiff remained in the hospital from February 17 through March 6, 1981. In May, 1981, plaintiff returned to the hospital for two days to remove a pin inserted in plaintiff's thumb in connection with the earlier operation. The operation to improve the functioning of his hand was not, however, successful; and plaintiff remains unable to grasp with his right hand.

Plaintiff also has no use of his left hand as a result of flexion contractures in the palmar muscles associated with his syringomyelia. It is likely, moreover, that, even without defendant's negligent treatment of the infection of his right hand and arm, plaintiff would eventually have suffered a loss of use of his right hand solely as a result of his syringomyelia. A certain degree of weakness of grip in plaintiff's right hand was noticed as far back as 1971 when plaintiff's left hand had already became clawed as a result of muscle contractions. The syringomyelia had also by 1978 impaired his sense of balance and ability to walk to the extent that he required, according to his own testimony, "a lot of help, such as having someone with you at all times, a wheelchair, and transportation." Even before the 1979 admission, in other words, plaintiff appears to have been unable to use his right hand for much more than the pinching motion necessary to hold a spoon, or simple tools.

I cannot believe, given the description of plaintiff's limitations by his friend and neighbor, Mrs. Cheatham, that he could safely grasp and use a cane to walk prior to the operation. Plaintiff arrived at the Medical Center in a wheelchair and described himself to his friends as confined to a wheelchair before his 1979 hospital stay. To the admitting nurse he described his ability to ambulate as "limited .... only half a room and his bed." Hospital notes at the PHS hospital also describe him as "barely able to walk."

## Liability

 It is clear from the above that defendant's employees were negligent in their treatment of plaintiff. As a result of a failure to examine the X-ray, an oral report of the presence of a metallic object in plaintiff's right hand was apparently taken to mean that the object was the source of plaintiff's open wound at the base of his middle finger. When it was perceived that plaintiff was suffering from an infection it was then incorrectly assumed that the infection was either an aerobic infection in the open wound appropriately treated with local antiseptics or, if an anaerobic infection, was limited to osteomyelitis in the bone of the middle finger at the base of which the metal object was believed to have entered. What defendant's employees negligently failed to discover was that plaintiff was suffering from a much more serious gas forming streptococcal infection in his arm which was attacking the tendons and muscles of both arm and hand and which could only be dealt with by systemic antibiotics and surgery. The failure to examine either the X-ray or the radiologist's report, which was apparently not transcribed until January 7, 1980, was an unreasonable departure from acceptable medical practice with the clearly foreseeable risk, particularly given plaintiff's recognized inability to report the source of his infection by indicating the location of pain, that another source and type of infection would be masked by superficial appearances and remain untreated with serious, if not life threatening, consequences for plaintiff. Negligence is also apparent in the unreasonable delays in responding to requests for consultations, including, the delay by the dermatologist in reporting his concern that a second orthopedic consultation was in order and the extraordinary delay by the radiologist in reporting his findings concerning the location of the metallic needle at plaintiff's wrist and the presence of "diffuse cellutis." In addition, it is apparent that there was a general lack of attention to plaintiff's situation and specifically to the "extensive swelling throughout the hand" described in the radiologist's report and to plaintiff's com-

plaints of pain despite his general insensitivity caused by his syringomyelia. Finally, defendant's employees were negligent in failing to act with reasonable dispatch to determine whether plaintiff was suffering from osteomyelitis and in failing to treat that condition in his finger with reasonable promptness.

## Damages

Plaintiff makes no claim for lost wages, earning capacity, medical expenses or loss of consortium. Nor, because of his preexisting syringomyelia, does he make any claim for pain.

He does claim suffering and is entitled to an award with regard to the severe mental anxiety he understandably experienced as a result of the general neglect of the foul smelling odor, unusual sensations of pain and extensive swelling he experienced in his hand and forearm. Plaintiff credibly explained that he felt as though he had been left to die. His feelings at the time were of such strength as to persuade him, despite his substantial experience with doctors and in hospitals, to leave the hospital against medical advice. An award of $1,000 for this emotional anguish caused by the neglect of defendant's employees between January 1 and January 5, 1982, appears appropriate.

Plaintiff likewise appears entitled to compensation for the suffering occasioned by the series of six operations required by the failure of defendant's employees to deal promptly with plaintiff's condition by systemic antibiotics. Although by reason of his underlying condition plaintiff was insensitive to pain, the hospital progress notes detailing the discomforts and intrusiveness of the nursing care necessitated by his continuous post-operative state entitled to recognition in a damages award. Taking into account plaintiff's own testimony and the detailed report of his hospital stay,[6] an award of $2,500 for this period appears appropriate.

There remains for consideration the difficult question of the value of the loss of function in plaintiff's right hand which it appears reasonable to conclude was substantially accelerated as a result of defendant's negligence. As evidenced by the effort of the PHS hospital doctors both in 1980 and 1981 to improve the functioning of the hand, by moving plaintiff's index finger to the base of his amputated middle finger, plaintiff was not so incapacitated by his disease that there was no hope of restoring some function to the hand. The effort to improve the functioning of the hand, which had been impaired by the severance of the tendons to three fingers incident to plaintiff's many operations, failed. Plaintiff is accordingly entitled to recover for the value of the accelerated loss of function of the hand as a result of the negligence of plaintiff's employees.

The value of the right hand for this period of time must take into account the fact that it was the only functioning one plaintiff had been left with because of the earlier loss of function of his left hand. The accelerated loss of function included loss of the ability to handle eating utensils or simple tools or to perform the myriad of other minor tasks that require the pincer-like function that plaintiff's doctors sought to restore to his hand by the 1981 operations. The figure of $24,709.65 appears to the undersigned fair and reasonable, as representing the discounted present value of this function for the few years in the future during which plaintiff would have had that function, but for defendant's negligence, and for the loss of that function to date.[7]

Accordingly, the Clerk is directed to enter judgment in favor of plaintiff and against defendant in the total amount of $28,209.65 plus interest from the date of judgment and to mail a copy of this Memorandum Decision to counsel for both sides.

SO ORDERED.

---

6. *E.g.*, a note of March 5, 1980, reads in part: "Patient states he's somewhat depressed over his lengthened hospital stay. Encouraged to verbalize. Emotional support given."

7. This discount rate employed is that authorized in *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30 (2d Cir.1980), *cert. denied sub nom. Pittston Stevedoring Corp. v. Doca*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981).