Dennis McCRANN, Plaintiff-Appellee, Cross-Appellant,

v.

UNITED STATES LINES, INC., Defendant-Appellant, Cross-Appellee.

Nos. 177, 288, Dockets 86–7485, 86–7545.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 1986.

Decided Oct. 20, 1986.

George J. Cappiello, Jr., Phillips & Cappiello, P.C., New York City, for plaintiff-appellee, cross-appellant.

Richard C. Burns, Gulmi LaPenta Campbell Burns & Mahoney, New York City, for defendant-appellant, cross-appellee.

Before KAUFMAN, KEARSE and ALTIMARI, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

As any student of elementary economics knows, time has monetary value for some purposes. A dollar in hand today is worth more than a dollar to be paid a year from today, and a dollar a year from today is worth more than a dollar to be received in two years. This basic principle of finance is employed by courts daily in calculating appropriate damage awards, to ensure that parties receive neither an undeserved windfall nor an unfair penalty. Yet it is remarkable how basic economic concepts can become convoluted by the parties when large sums are at stake.

In the case now before us, we are confronted with two questions concerning the proper means of calculating damages in a personal injury action. The parties challenge the methods employed by the district court to determine the applicable rates for discounting the judgment to present value and for calculating prejudgment interest. Plaintiff contends that the discount rate employed was excessive, while defendant argues that the rate used to calculate prejudgment interest was too high. After briefly stating the facts, we shall demonstrate that the well-settled practices of this Court require rejecting both the appeal and cross-appeal. We therefore affirm the judgment of the district court.

Dennis McCrann ("appellee") was an American seaman who sailed as an electrician aboard the S.S. American Champion, a vessel owned by United States Lines, Inc. ("appellant"). On November 29, 1979, appellee sustained injuries to his neck and right elbow when he slipped and fell on a deck covered with a mixture of oil and water. He commenced this action on January 27, 1981, seeking compensatory and punitive damages pursuant to the Jones Act, 46 U.S.C. § 688, and general maritime law.

After a bench trial, the district court found that McCrann's injuries were due to appellant's negligence and the unseaworthiness of appellant's vessel. Specifically, Judge Lasker found that water leakage through supposedly watertight doors on the vessel had caused McCrann to slip and injure himself. The court also determined that appellee's injuries rendered him unfit for employment in his former capacity as a seaman-electrician, and awarded him $275,-

544 in compensatory damages for past and future loss of earnings. On October 25, 1985, the trial court awarded appellee an additional $20,000. in damages for pain and suffering.

On May 8, 1986, Judge Lasker ordered McCrann's projected earnings to be discounted to present value, and added prejudgment interest to the award. The court employed a rate of 2% to discount the total lost earnings back to the date of injury, and calculated prejudgment interest at a rate of 10.397%. An amended judgment was filed on May 21, 1986, awarding appellee $420,044.39, including prejudgment interest of $168,387.39. Appellant filed a notice of appeal and appellee cross appealed.

## DISCUSSION

Before addressing the contentions of the parties, a brief review of the basic concepts involved in calculating damage awards for lost wages is in order. We begin with the principle that a tortfeasor should be required to put his victim in the same economic position that he would have occupied had he not been injured. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533, 103 S.Ct. 2541, 2548, 76 L.Ed.2d 768 (1983). When an injury renders a worker unfit to continue in his trade, the court must first calculate his projected salary for each year that he could have worked. Assuming ten more years of gainful employment at $10,000 per year, however, the worker would realize a windfall if he received a judgment of $100,000, since that sum could earn substantial amounts of interest in the bank. Therefore, the court would reduce the judgment by awarding plaintiff the present value of each year's payments. Invested at an interest rate of 6% compounded monthly, $9434 grows to $10,000 at the end of one year, and $8900 grows to $10,000 after two years. Discounting each year's payments and then adding up the total of the discounted amounts, the court would award the present value of the future income stream. *Taliercio v. Compania Empressa Lineas Argentina*, 761 F.2d 126, 129 (2d Cir.1985), *following Jones & Laughlin Steel Corp.*, 462 U.S. at 538, 103 S.Ct. at 2551. In this example, the plaintiff would receive $73,-601.[1]

If the award were disbursed at the precise moment of injury, and if the economy were free of inflation, this calculation would represent a fair award of damages. However, neither of these assumptions holds true. Therefore, certain adjustments must be made. Consider inflation first. Just as the defendant would be unfairly penalized if required to pay the full $100,-000 today, rather than the discounted sum of $73,601, so would the plaintiff be undercompensated if the court failed to account for the effects of inflation on his award. Therefore, courts will either subtract the estimated rate of inflation from the prevailing market rate of interest before discounting the judgment to present value or account for the effects of inflation in projecting the plaintiff's wages. *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 34–38 (2d Cir.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). Assuming an inflation rate of 4% and a prevailing interest rate of 6%, the discount rate would be reduced to 2%, and the damage award would now come to $89,826.

Finally, we must account for the additional factor of prejudgment interest. In theory, the tortfeasor incurs his obligation to make the plaintiff whole the instant that the injury occurs. In reality, of course, the plaintiff must wait until the litigation has run its course before realizing a judgment. Since the plaintiff was entitled to the interest income on the damage award from the date of injury to the payment of judgment, courts award prejudgment interest to ad-

---

**1.** Generally, to calculate the value today of $1 payable $t$ years from now, ask how much must be invested today at compounded interest to grow into $1 at the end of $t$ years. We know that at $i$% compounded interest any principal grows in $t$ years proportionally to $(1 + i)^t$.

Thus, by inverting this expression, we arrive at the final answer: The present value of $1 payable $t$ years from now is $1/(1 + i)^t$. *See Dullard v. Berkeley Assoc. Co.*, 606 F.2d 890, 895 n. 4 (2d Cir.1979).

dress the disparity. *Independent Bulk Transport, Inc. v. Vessel "Moraina Abaco,"* 676 F.2d 23, 26 (2d Cir.1982); *see also Taliercio,* 761 F.2d at 129. If a year passed between the moment of injury and the date of judgment, and the prevailing interest rate was 6%, our hypothetical plaintiff would receive an additional $5,479, bringing his final award to $95,305.

Equipped with these basic concepts, we can now turn to the merits of the appeal. The district court determined that McCrann's past and future loss of earnings amounted to $275,444, before discounting or adjusting for inflation. In arriving at this sum, the court took into consideration his salary at the time of injury, his remaining work expectancy of 16 years, and his projected ability to mitigate damages. Judge Lasker then discounted that sum at the rate of 2% per year, relying on this Court's instruction in *Doca* to use 2% absent evidence of a more appropriate rate. Finally he awarded prejudgment interest on the discounted figure and the $20,000 pain and suffering award, using the average interest rate paid on six-month United States Treasury Bills from November 29, 1979 to February 1, 1986, or 10.397%. The total award came to $420,044.39.

## PREJUDGMENT INTEREST

Appellant maintains that the district court erred in selecting a prejudgment interest rate of 10.397%. Specifically, appellant contends that the rate applied to calculate the prejudgment interest cannot exceed the discount rate, which the court set at 2%. This contention, however, is supported by neither logic nor precedent. The prejudgment interest rate is greater than the discount rate in this case for one simple reason: while it is appropriate to subtract the rate of inflation in calculating the discount rate, it would make no economic sense to do the same in figuring the prejudgment interest. When calculating the latter sum, it is wholly proper to award the unadjusted market rate of interest, which includes an inflationary component, since that is the rate at which appellee

could have invested the money. *Independent Bulk Transport,* 676 F.2d at 27; *see also Granholm v. TFL EXP,* 576 F.Supp. 435, 456 (S.D.N.Y.1983).

Appellant improperly relies on *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 594 (2d Cir.1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962), to argue that the discount rate and prejudgment interest rate should be identical. In *Moore-McCormack,* the court stated that the rates ought to be the same, but the case was litigated before the practice of reducing the discount rate by the rate of inflation became universally accepted by the courts. *Id.* at 594; *see, e.g., Doca,* 634 F.2d at 34–38. Even today, it is true that if the plaintiff's projected salary is increased by an inflationary factor in the initial calculation, the discount rate may mirror the market rate and, accordingly, also be identical with the prejudgment interest rate. But where the court employs an adjusted discount rate, as did Judge Lasker, the rates will not be the same. Instead, the prejudgment interest rate will exceed the discount rate by roughly the rate of inflation. *See Doca,* 634 F.2d at 38–40.

Appellant's reliance on *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45 (2d Cir.1984), also is misplaced. In a slip opinion dated July 30, 1984, Judge Winter stated in footnote 8 that the New York wrongful death statute required identical rates of discounting and prejudgment interest. The slip opinion, however, was amended on October 1, 1984, and the language upon which appellant relies was deleted. Although appellant mischievously characterizes the amended opinion as "uncorrected," in fact the amended version represents this Court's official opinion.

## DISCOUNT RATE

At trial, appellee elicited testimony from an economist, who testified that the appropriate discount rate was zero rather than 2%. Conceding that in most cases 2% is a fair discount rate, he argued that in this case that rate should be reduced. The economist maintained that the district court

failed to account for wage increases the appellee would have received in the future due to factors unrelated to inflation, such as increased seniority and productivity. Reducing the discount rate to zero, he asserted, would compensate the appellee for this oversight. As he put it, "it would be eminently fair, since we are going 10 years into the future, to assume a wash." *Record*, at 110.

■ In his memorandum decision, Judge Lasker stated that he found this testimony "unconvincing." Appellee now contends that *Doca*, 634 F.2d at 30, required the district court to accept the uncontroverted testimony of the economist, and that Judge Lasker abused his discretion in employing a discount rate of 2%. We disagree. In *Doca*, Judge Newman made clear that we were not

> requiring the use of an adjusted discount rate, nor specifying that when such a rate is used, it must be set at 2%. Litigants are free to account for inflation in other ways, or, if they use the adjusted discount rate approach, to offer evidence of a rate more appropriate than 2%. But in the hope that disputes about the appropriate rate may be minimized, we simply suggest the 2% rate as one that would normally be fair for the parties to agree upon, and we authorize district judges to use such a rate if the parties elect not to offer any evidence on the subject of either inflation or present value discount.

*Doca*, 634 F.2d at 40.

■ We decline to read this language as dictating that courts are bound by the mere existence of evidence in the record concerning the appropriate discount rate, regardless of the credibility of that testimony. Rather, the instruction must be interpreted in light of the primary principle enunciated in *Doca*, making the determination of the applicable discount rate a matter for the trial court's discretion. *Doca*, 634 F.2d at 39, 40. Accordingly, we now reaffirm our holding that courts applying an adjusted discount rate are free to use 2% where the evidence of a more appropriate rate is unconvincing.

Appellee contends that *Van Nijenhoff v. Bantry Transportation Co.*, 791 F.2d 26 (2d Cir.1986), requires the trial court to accept any evidence in the record regarding the applicable discount rate, regardless of credibility. In fact, however, that case is entirely consistent with our decision today. In *Van Nijenhoff*, the trial judge set aside the 20% discount rate applied by the jury, noting that it had no support in the record. He then substituted a 10% figure. On appeal, we held that where the trial court elects to deviate from *Doca's* 2% standard, it must use a rate that was supported by the evidence. We found that the 10% figure was not supported by the record, and recalculated the discount rate at 6%.

In the instant case, the economist's testimony was not illogical. The Supreme Court has noted that a worker's annual wage at the time of injury is but the starting point in estimating lost future wages:

> Even in an inflation free economy—that is to say one in which the prices of consumer goods remain stable—a worker's wages tend to "inflate." This "real" wage inflation reflects a number of factors, some linked to the specific individual and some linked to broader societal forces. With the passage of time, an individual worker often becomes more valuable to his employer. His personal work experiences increase his hourly contributions to firm profits. To reflect [this], he will often receive "seniority" or "experience" raises, "merit" raises, or even promotions.... Furthermore, the wages of workers as a class may increase over time. Through more efficient interaction among labor, capital, and technology, industrial productivity may increase, and worker's wages may enjoy a share of that growth.

*Jones & Laughlin*, 462 U.S. at 535, 103 S.Ct. at 2551 (footnotes omitted).

While the expert's argument was theoretically plausible, Judge Lasker found it unconvincing here. The economist's testimony was generally confusing and cryptic on this complex issue. Moreover, the econ-

omist's exegesis abounded in approximations and failed to cite a single authority. Indeed, the portion of testimony upon which appellee relies consists solely of two paragraphs, imprecise to say the least:

> In the maritime industry, the compounded annual rate of increase has been in the neighborhood of 8 percent and the CPI has been running 3½ to 4 percent, which would leave about 4.5—4.4 to 4.5 percent, and currently the real interest rates have been running in the immediate period of time about 4 percent, 3.5 percent to 4 percent real interest rates, and over a long period of time they will average out to around 2 percent.

> Therefore, I felt that it would be eminently fair, since we are going 10 years into the future, to assume a wash rather than to try to dot the *i* and cross the *t* and add to the earnings perspective wage increases based upon productivity inflation, segregate the real earnings and add just for real earnings and leave inflation out of the picture and then discount.

*Record,* at 110.

We conclude, therefore, that Judge Lasker did not abuse his discretion by rejecting the expert's assertions and applying a discount rate of 2%.

Accordingly, we affirm the judgment of the district court.