John **WESTERMAN**, Plaintiff,

v.

**UNITED STATES of America and Todd Shipyards, Inc., Defendants.**

No. 79–CV–2759.

United States District Court,
E.D. New York.

July 28, 1983.

**486**

Zimmerman & Zimmerman by Thomas J. Doyle, New York City, for plaintiff.

J. Roger Carroll, New York City, for defendant Todd Shipyards.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y., Janis G. Schulmeisters by Paul A. Winick, New York City, for defendant U.S.

## DECISION AND ORDER

BRAMWELL, District Judge.

Plaintiff, John Westerman, was employed as a rigger by Banks Rigging Corp. (Banks). He was injured when he slipped and fell on grease while carrying out his assigned duties aboard the U.S.S. Marius (MARIUS). Defendant, United States of America (United States), is the owner of the vessel; it contracted with defendant, Todd Shipyards Corp. (Todd), to perform repair work on board the MARIUS and Todd, in turn, subcontracted certain items of this work to Banks. Banks' insurer awarded Westerman $16,191.76 in settlement of his claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) 33 U.S.C. §§ 901–950 (1976). On March 17 and 18, 1983, this Court entertained Westerman's third party negligence suit against both the United States and Todd. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the issue of defendants' liability will be resolved through Findings of Fact and Conclusions of Law as follows.

1. The numbers in parentheses denote reference to the transcript of the trial.

## FINDINGS OF FACT

1. The MARIUS is a public vessel owned by the United States.

2. At the time of plaintiff's injury, the MARIUS carried a utility boat and a life boat on board. These boats were secured by devices known as gravity davits (davits). (93)[1]

3. In a stored position, each boat was suspended on wires between two davits. The davits were secured by a locking bar and a preventer wire which ran from a horizontal beam above the deck to the track. (Pl.Ex. 1, 48–49)[2]

4. In order to release one of the boats, the locking bar and preventer wire had to be removed. When this was accomplished, the davits would slide down a track and swing the boat out over the side of the vessel where it could be lowered into the water. (48–49)

5. In order to return the boat to an upright position, an electric winch was used to pull the davits back up the track. The winch tugged on a wire which was threaded through pulleys called "sheaves". The sheaves were located near the top of the davits. The wire, sheaves and track were customarily lubricated with grease. (85)

6. In June 1979, the United States, through the Military Sealift Command, an agency within the Department of the Navy, entered into a contract with Todd whereby repair and maintenance was to be performed by Todd on the MARIUS. (Pl.Ex. 3, 89–90)

7. The contract between the United States and Todd consisted of a Master Repair Contract (Pl.Ex. 2); a Job Order (Pl.Ex. 3); and contract specifications. (Pl.Ex. 4, 5, and 6)

8. In accordance with the terms of the Master Repair Contract, Todd was required to do the following:

    a) Use reasonable care to prevent accidents aboard the vessel. [Pl.Ex. 2, cl. 10(a)]

2. "Pl. Ex." denotes reference to the numbered exhibit introduced by plaintiff at the trial.

b) "keep the site of the work on the vessel free from accumulation of waste material and rubbish caused by his employee or the work, and at the completion of the work...remove all rubbish from and about the site of the work and...leave the work in its immediate vicinity 'broom clean', unless more exactly specified in the job order." [Pl.Ex. 2, cl. 5(i)]

c) "furnish all necessary material, labor, services, equipment,...and such other things...as are necessary for accomplishing the work specified in the job order..." [Pl.Ex. 2, cl. 4(d)]

9. In accordance with the terms of the Master Repair Contract, the United States retained the right to inspect the work performed by Todd in order to determine whether it was completed in compliance with contract specifications. [Pl.Ex. 2, cl. 5(c)] The United States Navy crew aboard the MARIUS, however, did not supervise the manner of performance of the repair work contracted to Todd. (105–6)

10. The job order issued pursuant to the Master Repair Contract between the United States and Todd required Todd to perform the following work on the davits:

a. Item No. 24 of the contract required Todd to disassemble, inspect and reassemble and replace worn parts in the davit sheaves. The sheaves were to be lubricated with grease during reassembly. (Pl.Ex. 4)

b. Item No. 105 of the contract required Todd to perform a suspension test of the davit mechanism. The test consisted of the operation of the davit mechanism with a specified amount of weight placed in the boat. (Pl.Ex. 4)

11. Todd, however, subcontracted the work specified in items No. 24 and 105 to plaintiff's employer, Banks. (Def. Todd Ex. A & B)[3]

12. The subcontract between Todd and Banks consisted of two purchase orders and a statement of general safety rules applica-ble to Banks. (Def. Todd Ex. A, B, C, D & E)

13. The purchase order prepared by Todd subcontracting the work specified in item 24 to Banks was issued on July 5, 1979. A similar purchase order subcontracting the work specified in item 105 to Banks was issued on July 18, 1979. [114, 117, 119, 119(a)]

14. Each purchase order issued by Todd to Banks required Banks to furnish all necessary materials, equipment and labor to accomplish the work specified in the purchase order. (Def. Todd Ex. A & B, 120–21)

15. The rules statement issued by Todd to Banks additionally required Banks to assume responsibility for the "housekeeping" or the cleanliness of the job site. (Def. Todd Ex. E, 122, 129–130)

16. Todd, like the United States, retained the right to inspect the work performed by Banks in order to determine whether it was completed in compliance with the subcontract. (Pl.Ex. 4, 24–25) And like the United States, Todd did not actively supervise or instruct Banks in the manner of performance of the work specified in the subcontract. (123) Todd, however, did "keep an eye on" the work performed by Banks as it progressed. (127)

17. The repair work and rebuilding of the sheaves specified in item 24 of the contract between the United States and Todd was performed by Banks pursuant to its subcontract with Todd. The work included the regreasing of the sheaves located at the top of the davits. (Def. Todd Ex. A)

18. According to both trade custom and the terms of the subcontract, the sheave work specified in item 24 was to have been performed prior to the boat suspension test specified in item 105 [100, 119–19(a)]. The plaintiff, however, submitted documents indicating that both jobs were completed by Banks on the date of plaintiff's injury, August 8, 1979. Defendant Todd, on the other hand, submitted evidence indicating that both jobs were completed on August 7, 1979. (Def. Todd Ex. C & D) The latter

**3.** "Def. Ex." denotes reference to the lettered exhibits introduced by defendants at the trial.

date is manifestly inaccurate, as the suspension test signed off as completed on August 7, 1979 was not even commenced until the following date, August 8, 1979. (7) The court cannot credit either set of documents as dispositive of the date on which the sheave repair work was completed. Thus, the evidence does not clearly establish the completion date, or the fact that the sheave work was completed prior to the commencement of the suspension test.

19. Both the United States and Todd inspected the sheave repair work specified in item 24. However, the discrepancy described above also precludes establishment of a definite date for either inspection. Although the purchase order for work specified item 24 is stamped by the port engineer, an employee of the United States, as satisfactorily completed on August 7, 1979, this evidence cannot be accepted as credible. (Def. Todd Ex. C) The purchase order for work specified in item 105 is likewise stamped as satisfactorily completed on August 7, 1979. (Def. Todd Ex. D) As indicated above, the work specified in item 105 was not even commenced until the following day, August 8, 1979.

20. On August 8, 1979, during performance of the work specified in item 105, plaintiff suffered the injuries that form the subject matter of this lawsuit. (7)

21. On that date, at 7:30 AM, plaintiff reported to work at the Banks shop which is located approximately ten blocks from the Todd shipyards where the MARIUS was docked. (8)

22. At approximately 8:45 AM, plaintiff, along with several other Banks employees including his supervisor, Mr. Sansano, traveled from the Banks shop to the Todd shipyards to perform the work specified in item 105. (9, 47)

23. Upon arriving on board the MARIUS, the Banks crew, including plaintiff, proceeded to the utility boat located in the starboard side davits. (10)

24. Thereafter, the Banks crew began to prepare the boat and the davits for the suspension test by releasing the locking bar and the preventer wire that secured the davits in a stored position. (11)

25. The preventer wire, however, was caught at the top of one of the davits where it was threaded through a padeye. It, therefore, became necessary to loosen the preventer wire manually. (16).

26. Plaintiff was directed by his supervisor, Mr. Sansano, an employee of Banks, to climb to the top of the davit to release the preventer wire. (24)

27. Iron rungs were located on the side of the davit that plaintiff was directed to scale. (Pl.Ex. 1) These rungs ran from a point above the track to a point near the top of the davit (Pl.Ex. 1; 17). There was, however, no ladder running from the deck of the vessel up to the point at which the rungs commenced on the davit. (20)

28. Plaintiff asked people on the deck in the vicinity of the davits for a ladder. Although plaintiff testified that he believed these individuals were employees of Todd and the United States, he did not identify any person by either name or position. No one knew where a ladder could be found. (21)

29. Banks owned ladders that were available to its workers for use on the job, yet the Banks crew did not bring a ladder with them when they traveled to the Todd shipyards on August 8, 1979. (47, 83)

30. After the Banks crew spent approximately twenty minutes looking unsuccessfully for a ladder, the Banks supervisor, Sansano, directed plaintiff to climb to the top of the davit, without a ladder, in order to release the preventer wire. (23–24)

31. Plaintiff proceeded to scale the davit by stepping from the deck of the vessel to the top of the winch motor, and then climbing over the track and onto the rungs on the side of the davit. (Pl.Ex. 1, 25–26)

32. Plaintiff first noticed grease on the rungs of the davit as he was climbing them. (29, 49)

33. Plaintiff did not wipe up the grease but attempted to sidestep it as he continued to climb the davit. (29, 49)

34. Plaintiff freed the preventer wire at the top of the davit and began his descent down the rungs. As he was stepping off the rungs to get back to the motor, he slipped on the grease. (28, 80) Plaintiff fell to the deck and was injured. (27–8)

35. Plaintiff testified that when he fell to the deck he injured his right shoulder, lower back, right knee, ankle, arm and elbow and head. (32)

36. Plaintiff was taken off the ship by his co-workers and taken by ambulance to the emergency room of Long Island College Hospital. At the hospital plaintiff's back and neck were X-rayed. No X-rays were taken of plaintiff's leg. Plaintiff was not admitted to the hospital. (33–35)

37. Two days later, on August 10, 1979, plaintiff went to his personal physician, Dr. Parisi. (36)

38. Plaintiff was treated by Dr. Parisi and his associate, Dr. Patel, from August 10, 1979 to February 20, 1980. During that period plaintiff received physical therapy in the form of heat treatments, whirlpool, massage, intermittent cervical traction, and active and passive exercise of the injured portions of his body. Plaintiff received a total of approximately 70 therapy treatments between August 10, 1979 and February 20, 1980. (140–153)

39. Dr. Parisi's initial diagnosis on August 10, 1979, was acute cervical dorsal sprain with tenderness, spasm and decreased range of motion; contusion and abrasion of the dorsal area; severe sprain of the lumbosacral area and sprain of the right shoulder. The doctor noted no complaints of head injury. (161–162)

40. Dr. Parisi found plaintiff fit to return to light duty work on February 5, 1980. (153)

41. On February 20, 1980 plaintiff was discharged by Dr. Parisi and was returned to regular duty. (53–155, 163)

42. The plaintiff was next examined concerning these injuries on March 7, 1983, some three years after he was discharged from care. Plaintiff had not been seen by Dr. Parisi's office at any time from February 20, 1980 to March 7, 1983, and lost no work after February 20, 1980. (39)

43. On March 7, 1983, Dr. Patel found that plaintiff had a minor restriction in the terminal ranges of movement of the right shoulder joint and spasm in the muscles of the lower back. (156–57)

CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over this action pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. 902(3) and 905(b).

2. Pursuant to the terms of the subcontract between Todd and Banks, Banks undertook to perform the work originally specified in items 24 and 105 in the contract between the United States and Todd. (Def. Todd Ex. A & B)

3. Pursuant to the subcontract between Todd and Banks, Banks had a duty to perform the work specified in items 24 and 105 in a workmanlike manner and to clean up any debris caused as a result of performing the work. (Def. Todd Ex. A & B)

4. Pursuant to the subcontract between Todd and Banks, Banks had a duty to furnish all necessary equipment to perform the work specified in items 24 and 105. (Def. Todd Ex. A & B)

5. Banks was negligent in failing to clean up the grease that had accumulated in the area of the ladder rungs as a result of the regreasing of the sheaves as specified in item 24.

6. Banks was negligent in failing to provide a ladder which would have enabled the plaintiff to safely complete the work specified in item 105.

7. The United States, as vessel owner, had no general duty to provide plaintiff with a safe place in which to work. *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 1615, 68 L.Ed.2d 1 (1981).

8. As a matter of law, the United States, as vessel owner, had no duty to instruct or supervise the performance of the work which was contracted to Todd and,

subsequently, subcontracted to Banks. *Scindia, supra* 101 S.Ct. at 1624.

9. Pursuant to its contract with Todd, the United States did not assume a duty to inspect the work contracted to Todd and, subsequently, subcontracted to Banks so as to discover dangerous conditions which developed during the performance of the work.

10. The United States did not become liable to plaintiff on the theory that it maintained active control over the work area in which the davits were located. *See Moore v. Howlett, Inc.,* 704 F.2d 39 (2d Cir.1983).

11. The United States did not become vicariously liable for the negligence of Banks because it reserved the right to inspect the work performed by Banks in order to determine whether it was completed in accordance with contract specifications. *See* Restatement (Second) of Torts, § 414 and comment *c.*

12. Plaintiff did not show that Todd had actual notice of the grease on the davits. Therefore, plaintiff did not prove that Todd breached a non-delegable duty to eliminate "slippery conditions" as they occur. *See Doca v. Marina Mercante Nicaraguense, SA,* 634 F.2d 30 (2d Cir.1980).

13. Todd did not become vicariously liable for the negligence of Banks merely because it reserved the right to inspect the work performed by Banks in order to determine if it was completed in compliance with contract specifications. *See* Restatement (Second) of Torts, § 414 and comments *b & c.*

---

4. 33 U.S.C. § 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons en-

## DISCUSSION

### Liability of the United States

■ Liability of the United States in this case is governed by § 905(b) of the LHWCA[4] which permits an injured ship repairman to bring negligence against a shipowner. In 1972, Congress amended § 905(b) to remove the faultless liability of a vessel owner on grounds of breach of seaworthiness. *See Napoli v. Transpacific Carries Corp.,* 536 F.2d 505 (2d Cir.1976). Although the 1972 amendments clearly established that a vessel owner is responsible only for its own negligence and not the negligence of persons providing stevedoring or repair services on board the vessel, 33 U.S.C. § 905(b), they did not specify exactly which actions and omissions constitute negligence on the part of the vessel owner. Recently, however, in *Scindia Steam Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 1615, 68 L.Ed.2d 1 (1981), the Supreme Court had occasion to consider the meaning and application of § 905(b). *Scindia* dealt specifically with the interrelationship between the duty owed to a longshoreman by a shipowner, and that owed by a stevedore. The principles which emerge from *Scindia,* however, apply equally to the duty owed by a shipowner to a repairman employed by an independent contractor engaged to do work on board the vessel. *See* 33 U.S.C. § 902(3) and (4).

Once control of the vessel has been relinquished to the contractor, the *Scindia* Court held, the shipowner can generally rely on the contractor to avoid exposing the repairman to unreasonable hazards. *Scindia,* 101

gaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

S.Ct. at 1623. *See also Lieggi v. Maritime Co. of Phillipines,* 667 F.2d 324 (2d Cir. 1981). According to the *Scindia* Court, the scope of the respective duties placed on the shipowner and the contractor is determined primarily by reference to statute, regulation and custom. *Scindia,* 101 S.Ct. at 1626. Section 941 of the LHWCA [5] requires the contractor, as the repairman's employer,[6] to provide a "reasonably safe" place in which to work. This section is further implemented by the Safety and Health Regulations for Longshoring, 29 C.F.R. § 1918.91(c) which places on the obligation to eliminate "slippery conditions" on the contractor.[7] Both the contract executed between the United States and Todd, and the subsequent subcontract between Todd and Banks, moreover, incorporated these regulations, and delegated the obligation for "housekeeping" first to Todd, and then to Banks. The conclusion to be drawn from the foregoing is that the dangerous condition caused by the grease was one which the United States could reasonably rely on the contractor, or subcontractor, to correct.

Plaintiff alleges that the United States is, nonetheless, liable for his injuries because it failed to properly inspect the worksite and remedy the hazardous condition that it should have discovered as a result of the inspection.[8] The Supreme Court in *Scindia,* however, opined that:

[A]bsent contract provision, positive law or custom to the contrary... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the [repair work] that [is] assigned to the [contractor]. The necessary consequence is that the shipowner is not liable to the [repairman] for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty. The shipowner, within limits, is entitled to rely on the [contractor], and owes no duty to the [repairman] to inspect or supervise the [repair work].

*Scindia,* 101 S.Ct. at 1624.

The contract between the United States and Todd called for an inspection by the United States upon completion of the work contracted out to Todd.[9] This inspection, however, was not a general safety inspection, but, rather, was performed solely to determine whether the work had been completed pursuant to contract specifications. Thus, the United States did not, by con-

---

**5.** 33 U.S.C. § 941(a) provides, in pertinent part:

Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health and safety of such employment, and to prevent injury to his employees.

**6.** 33 U.S.C. § 902(4) defines "employer" as follows:

The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

As the *Scindia* court pointed out, the shipowner is not the common employer of a repairman, and, thus, does not owe him the statutory duty imposed on the contractor by § 941. *Scindia,* 101 S.Ct. at 1623–24.

**7.** 29 C.F.R. § 1918.91(c) provides:

Slippery conditions shall be eliminated as they occur.

**8.** Originally, plaintiff additionally alleged that the United States was responsible to provide a ladder for repair work on the davits. This contention is clearly without merit as clause 4(d) of the Master Repair Contract between United States and Todd required Todd to provide "all... equipment... necessary for accomplishing the work specified in the job order..." (Pl.Ex. 2, cl. 4(d))

**9.** *See* clause 5(c) of the Master Repair Contract between United States and Todd. (Pl.Ex. 2)

tract, undertake a duty to inspect the contractor's work to discover and remedy dangerous conditions. Since, according to *Scindia,* no such duty was imposed on the United States as a matter of law, there is no basis on which this court can conclude either that the United States should have inspected the sheave work for safety hazards, or that the limited inspection actually undertaken by the United States would have revealed the presence of grease on the davit rungs.

Nor can this court find for the plaintiff on the basis of a narrow exception to the rule articulated in *Scindia.* The shipowner, the *Scindia* Court said, has a duty to correct a hazardous condition only if the following conditions are met: the shipowner had actual knowledge of the dangerous condition; the shipowner was aware that the contractor continued to work in spite of the dangerous condition; and the contractor's decision was so "obviously improvident" that the shipowner should have realized that the dangerous condition created an unreasonable risk of harm to the repairman. *Scindia,* 101 S.Ct. at 1627.

Plaintiff has not shown that the United States, by the inspection of the port engineer, had actual knowledge of the existence of the grease. At trial, plaintiff failed to prove when the United States, in fact, inspected the sheave repair work, and when, in relation to the time of the inspection by the port engineer, or the performance of the boat suspension test, the grease was deposited on the rungs of the davit. On plaintiff's theory of the case, the grease might have dripped onto the rungs at any time before *or after* the sheaves had been lubricated by Banks. The inspection by the port engineer, then, could have been performed either before, or after, the grease was deposited on the rungs. Thus, since plaintiff has not established that the United States had actual knowledge of the hazardous condition created by the grease, a threshold requirement of the *Scindia* exception, he has not shown that the United States had a duty to intervene in order to remedy the condition.

In the alternative, plaintiff seeks to hold the United States liable on the theory that the United States retained control over the area in which the davits were located. In *Scindia* the court noted:

> It is also accepted that the vessel may be liable if it * * * fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas or from equipment under the active control of the vessel during the [repair] operations.

*Scindia,* 101 S.Ct. at 1622.

In *Moore v. Howlett, Inc.,* 704 F.2d 39 (2d Cir.1983), a shipowner was held negligent in improperly maintaining a floating crane used in the stevedoring operations. In *Moore,* however, the plaintiff established two vital elements of his case: that responsibility to maintain the deck on which the crane was located rested on the shipowner, rather than the stevedore; and that the shipowner had actual knowledge of the ice and grease creating a hazardous condition on the deck prior to the time of plaintiff's injury. 704 F.2d at 41. Here, plaintiff has shown merely that the United States had supervisory personnel on board the MARIUS. This is hardly the level of control contemplated in *Scindia,* and evidenced in *Moore.*

Next, plaintiff argues that the United States is vicariously liable for his injuries because it retained control over performance of the work contracted to Todd, and, subsequently, subcontracted to Banks by reserving to itself a right of inspection. *See* Restatement (Second) of Torts, Topic 2, Introductory Note at 394 (1965) and §§ 410–429. Section 414 of the Restatement 2d provides as follows:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Comment *C* to section 414 further elaborates on the type of control to which section 414 is directed:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, ... Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

In *Hurst v. Triad Shipping Co.*, 554 F.2d 1237 (3d Cir.1977) the Third Circuit explained:

Thus, as comment "C" points out, an employer who retains only a general right to order that work be stopped or resumed and the right to inspect the progress of work to . . . assure compliance with specifications owes no duty of care to the employees of the independent contractor, concerning the manner in which his work is executed. Only when a significant degree of control is retained over the manner in which his work is performed, is the duty under Section 414 triggered.

554 F.2d at 1251.

Plaintiff's evidence did not show that the United States controlled the manner in which the work specified in items 24 and 105 was performed. On the contrary, the evidence indicates that the United States merely reserved the right to inspect the work to assure compliance with contract specifications. This degree of control is insufficient to justify liability and thus, plaintiff's case against the United States must fail.

*Liability of Todd*

█ Liability of Todd in this case is governed by contract law and regulation. In the contract between the United States and Todd, Todd assumed the obligation to furnish all necessary equipment to accomplish the work specified in items 24 and 105, and the responsibility to leave the worksite "broom clean." Thereafter, in the subcontract between Todd and Banks, both of these obligations were clearly delegated to Banks.[10] Plaintiff alleges, however, that although the subcontracted allocated "housekeeping" duties to Banks, 29 C.F.R. § 1918.91(c) discussed above, created in Todd, a non-delegable duty to keep the worksite clear of grease.

In *Doca v. Marina Mercante Nicaraguense, SA*, 634 F.2d Cir. 30 (2d Cir.1980), a corresponding regulation, § 1918.91(a) was held to impose upon a stevedore a non-delegable duty to remove a stumbling hazard even though the hazard was, by contract, the responsibility of the shipowner. *Id.* at 33. In *Doca*, however, plaintiff established that the stevedore was aware of the turnbuckle which caused his injury, yet continued working without making certain that the deck was clear. *Id.* By contrast, plaintiff here has not demonstrated Todd's actual knowledge of the grease which caused him to slip. The inspection performed by Todd, like that performed by the United States, was not a safety inspection but was performed simply to determine whether Banks' work was completed in compliance with the subcontract. Plaintiff, moreover, never established when the inspection by Todd, in fact, occurred. Thus, even if this court were to find itself bound by the language in *Doca* to the effect that regulatory obligations cannot be delegated, the absence of proof on the critical element of Todd's actual knowledge of the dangerous condition created by the grease defeats plaintiff's argument.

Finally, plaintiff contends that Todd, as prime contractor, is also vicariously liable for the negligence of its subcontractor, Banks. The rule of § 414 of the Restatement (Second) of Torts, cited above, is applicable as well when a prime contractor

---

**10.** Originally, plaintiff had argued that Todd was also negligent in failing to provide him a ladder with which to climb the davit. The purchase orders issued by Todd to Banks, however, clearly required Banks to provide all equipment necessary to accomplish the work specified in the subcontract. (Def. Todd Ex. A & B)

**494**

entrusts a part of the work to subcontractors but retains the right to superintend the job. *See* Comment *b.* In such a situation, the prime contractor is subject to liability if it fails to prevent the subcontractor from doing even the details of the work in a way unreasonably dangerous to others. *Id.* As stated above, however, this rule applies only when the prime contractor reserves the right to control the manner in which the prime contractor performs the work. Comment *c.* It is not sufficient that the prime contractor, as Todd did here, retains merely the right to inspect the work to determine whether it conforms with contract specifications. *See Hurst, supra* at 1251. Thus, the plaintiff has presented no theory by which this court can impose liability on Todd.

### CONCLUSION

For all of the foregoing reasons the court finds for defendants against plaintiff.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.